Strafford, }
Dec. 1, 1931. }

FLORENCE E. DECATUR v. BURT R. COOPER, *Adm'r c.t.a.*

252

*Hughes & Burns* (*Mr. Hughes* orally), for the plaintiff.

*Cooper & Hall* and *Conrad E. Snow* (*Mr. Cooper* orally), for the defendant.

BRANCH, J. The plaintiff was denied a recovery in this case because the court found that she was estopped from prosecuting her claim. The defendant has consistently contended, however, that regardless of the question of estoppel her case is fatally defective be-

cause there is no evidence of any promise on the part of the testator to pay for the services that form the basis of her account. Since a decision in favor of the defendant upon this point would dispose of the case it will be considered first.

The action of assumpsit is to recover damages for the breach of the decedent's promise to pay. To authorize a verdict against his estate this promise must be found as a fact. "Such fact may be found from an express promise of payment or from facts and circumstances from which a mutual understanding that payment was to be made may be inferred." *Elliot Hospital* v. *Turcotte*, 79 N. H. 110, 111.

There is no evidence of an express promise to pay in this case. The only testimony upon the subject is that of the plaintiff's husband, her only witness, who said that the deceased never promised to pay the plaintiff and that she never asked him to pay her.

As a basis for its conclusion that in the absence of an estoppel the plaintiff should have judgment for the full amount of her claim the trial court probably had in mind the well settled rule that "the rendition of valuable services by one to another who knowingly receives the benefit of them, is evidence of a mutual understanding that they are to be paid for." *Clark* v. *Sanborn*, 68 N. H. 411, 412; *Elliot Hospital* v. *Turcotte, supra.* It does not follow from this principle, however, that the establishment of these facts will in every case sustain a finding that the recipient of the services promised to pay for them. The mere fact that services have been rendered and a benefit received from the services so rendered does not establish a legal duty of payment. *Elliot Hospital* v. *Turcotte, supra.*

The rule merely embodies the sensible conclusion of the court that in the absence of countervailing considerations human experience justifies the inference that the voluntary acceptance of valuable services indicates an intention to pay for them. When the relationship of the parties, however, affords evidence that payment was not contemplated or that the labor was gratuitously performed the rule cannot apply because the reason for it fails. *Page* v. *Page*, 73 N. H. 305. These considerations are exemplified in the equally well settled rule that as between members of the same family the mere rendition and acceptance of valuable services will not justify the inference of a promise to pay. *Page* v. *Page, supra; Bundy* v. *Hyde*, 50 N. H. 116; *Hall* v. *Hall*, 44 N. H. 293; *Seavey* v. *Seavey*, 37 N. H. 125; *Munger* v. *Munger*, 33 N. H. 581. "The reason of this exception to the ordinary rule is, that the household family relationship is presumed to abound in reciprocal acts of kindness and good-will, which tend to the

mutual comfort and convenience of the members of the family, and are gratuitously performed." *Disbrow* v. *Durand*, 54 N. J. L. 343, 345, quoted in *Page* v. *Page, supra.*

The defendant seeks to invoke the rule last stated but we do not think that the plaintiff's claim can be defeated upon this ground as a matter of law. There is nothing in the evidence from which it could be found that the deceased knew about the contract which Roland and the plaintiff had made with Ethel and Arthur. Consequently the provisions of that agreement throw no light upon the testator's understanding of the terms upon which the plaintiff's services were rendered. All the parties agreed, however, that the testator paid the plaintiff five dollars per week during the entire time that they were members of the same household, and the court found that this payment was for board. These facts tend strongly to rebut the inference of gratuitous service which might otherwise be drawn from the family relationship and would warrant a finding that the decedent knew that the plaintiff was working for pay. The defendant goes further than this and asserts in his argument that the only conclusion which can be drawn from the evidence is that the deceased understood that he thus paid the plaintiff in full for all the services of every description which she performed for him. This is not, however, a necessary conclusion. Many of the acts of service described in the evidence and hereinafter referred to are of such a character that it might properly be found that they were not included in or incidental to a contract for board, and since the inference that they were gratuitously rendered does not necessarily follow from the fact of family relationship "the implication of law that the parties contemplated compensation therefor, in the absence of affirmative evidence to the contrary, warrants the finding of an implied promise" to pay. *Page* v. *Page, supra*, 309.

It does not follow, however, that the plaintiff is entitled to recover for all items of service rendered which do not come under the heading of board. By the terms of the contract with Ethel and Arthur, above mentioned, the plaintiff and her husband agreed for a stipulated consideration to make a home for his father. For her part in this task of "making a home" for the testator the plaintiff received compensation from Ethel and Arthur in the form of real estate conveyed to her husband according to the terms of that agreement. Although her present claim is nominally against the executor its allowance would obviously reduce proportionally the distributive shares of Ethel and Arthur in the estate. They are the real parties in interest represented by the executor in this litigation. Consequently upon equitable principles

of estoppel, to avoid circuity of action, the plaintiff will not now be heard to claim additional compensation from the estate of the deceased on account of services for which she has already been paid by Ethel and Arthur. *Robinson* v. *Leavitt*, 7 N. H. 73, 76-77, 89; *Rumsey* v. *Sargent*, 21 N. H. 397; *Snow* v. *Fletcher*, 43 N. H. 642, 645; *Atherton* v. *McQuesten*, 46 N. H. 205, 213; *Lockwood* v. *Dickey*, 83 N. H. 365, 369. For such acts of service as are fairly to be regarded as incidental to the task of "making a home" for the testator she cannot recover.

Some attempt was made on behalf of the plaintiff at the trial to deny that she was a party to the contract above referred to but this contention is without merit. The witnesses on both sides agreed that she had full knowledge of the contract which was evidenced in part at least by the memorandum of May 29, 1924, signed by Ethel and Arthur. The court finds that she knew of this memorandum and was present when it was signed. The statement in the memorandum that the agreement of Ethel and Arthur was made "in consideration of our brother, Roland W. Decatur and wife going to Barrington and making a home for our father," obviously presupposes an agreement on the part of "Roland W. Decatur and wife" that they would go to Barrington for that purpose. It is equally obvious that her coöperation was essential to the performance of any agreement on Roland's part to make "a home" for his father and throughout his testimony Roland referred to the agreement and its subsequent performance as a joint undertaking on the part of himself and his wife. The conclusion is almost irresistible that she was in fact and in law a party to the agreement, and the trial court seemed to assume or indirectly find that this was so, when reference was made to the fact "that the contract was written in the plural (thereby including the plaintiff)."

"It is manifest that the word 'home' has not such a fixed meaning that it would accurately and precisely limit an obligation like the one here in question." *Day* v. *Towns*, 76 N. H. 200, 201. Common knowledge tells us, however, that an undertaking to make a home for an aged man, afflicted with blindness, during his declining years, necessarily involves the performance of many acts of personal service which may increase in number and variety as time goes on. Many of the services performed by the plaintiff for the deceased were clearly of this character, such as guiding him about the house, getting him drinks of water and washing his bed linen—even though it was occasionally fouled. Serving his meals in bed when he was sick would appear to be obviously incidental to furnishing him board.

It would seem to be a question of fact whether some of the other services which the plaintiff performed were incidental to either of her contractual undertakings, such as shaving the deceased, cutting his hair, going with him to the toilet and dressing a running sore from which he suffered. During the last month of his life the testator was confined to his bed and for two weeks of this period the plaintiff took all the care of him. Apparently her services at this time were primarily those of a nurse and not within the scope of her functions as a home maker. In short the case presents questions of fact as to what types of service were incidental to the contractual obligations of the plaintiff, what were extras and what was the value of such extra services as the deceased received.

These questions were not passed upon by the trial court. It was found that "at all times there devolved upon her the extra tasks and additional house work which always accompanies the presence of an aged and infirm person in the household, which, as a matter of course, became more onerous as his disability increased. Her services in these respects were valuable and taken alone are fairly worth the amount set forth in the writ." No distinction is here drawn between contractual and extra-contractual services, and since the plaintiff can recover only for services rendered in excess of her contractual obligations, it follows that there was error in the subsequent ruling of the court that the plaintiff, if entitled to recover at all, "should have judgment for the amount of her claim, with interest."

In view of the conclusions reached above it becomes necessary for us to consider the issue of estoppel upon which the verdict of the court was based. It is strenuously contended by the plaintiff that she was under no legal duty to disclose the fact that she had a bill against the estate during the time her husband was negotiating with the other heirs with reference to a division of the testator's personal property; that any obligation that rested on her was at most a moral one out of which no legal rights can arise. The case of *Conway National Bank* v. *Pease*, 76 N. H. 319, compels the overruling of this contention. The questions when silence becomes a misrepresentation and when a legal duty to speak arises received exhaustive consideration in that case. The conclusion of the court is summarized in the following statement. "Silent conduct, maintained under circumstances disclosing that one knows or reasonably ought to know that it is misleading and will induce another to act in reliance thereon to his damage, may be found to be active intervention and a representation calling for the imposition of a duty to exercise care." *Ib.* 328.

The effect of this statement is that equity imposes a duty to speak when one knows or ought to know that his silence is misleading and will induce another to act upon it to his damage.

The trial court has found that the plaintiff must have known that the fact that she had a claim against the estate would, if disclosed, have had some influence in the settlement with her husband and that Ethel and Arthur probably would not have agreed to the terms of the settlement "had they been aware that Roland's wife had a bill for services." These facts clearly bring this case within the rule above stated and fully justify the conclusion of the court that "it was her duty to disclose" this fact.

The trial court, however, in rendering its verdict failed to apply another principle which was also enunciated in the case of *Conway National Bank* v. *Pease, supra, i.e.,* that "the loss occasioned by the misrepresentation" is the measure of the right of a party in whose favor an estoppel operates. The court in that case concluded that the jury should have been instructed that "they could award them [the plaintiffs] such a sum as the evidence showed they had been damaged by relying upon the defendant's misrepresentation, which might be equal to or less than the face of the note, as the evidence warranted." *Ib.* 336. So in this case the estoppel against the plaintiff is operative only so far as may be necessary to save Ethel and Arthur harmless from the consequences of their reliance upon the plaintiff's conduct, and hence the unqualified conclusion of the court that "she is now estopped from prosecuting her claim" cannot be sustained.

The value of the personal property received by the plaintiff's husband as a result of his settlement with the other heirs was $536. This sum represents the maximum of the damage which they sustained by reason of the plaintiff's conduct. It is found that the other heirs probably would not have agreed to the settlement "had they been aware that Roland's wife had a bill for services;" *non constat,* however, that they would have refused to allow Roland anything. It might therefore be found that their damage by reason of the plaintiff's conduct was less than $536. The plaintiff can recover only the amount by which the value of her extra-contractual services exceeds the damage caused to Ethel and Arthur by her conduct.

Since the case was tried by the parties and decided by the court upon erroneous theories of the law, we think the result should be regarded nugatory and the order therefore is

*New trial.*

SNOW, J., did not sit: the others concurred.